UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ELLA M. THOMAS,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )
                                         )   CASE NO. 1:05-cv-1183-DFH-WTL
DAVID WYSER, MARION COUNTY               )
SHERIFF'S DEPARTMENT, JANE DOE I,        )
and JANE DOE II,                         )
                                         )
                    Defendants.          )

ENTRY ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Ella M. Thomas has sued defendants David Wyser and the Marion County Sheriff's Department for alleged violations of her federal constitutional rights.  Thomas testified as a defense witness in the criminal trial of her son Danny Johnson for attempted murder.  She offered testimony to support an alibi. Defendant Wyser was the prosecutor in that case.  After Thomas testified, Wyser had her arrested and charged with felony perjury.  Because Thomas was charged with a felony, she was strip-searched as part of the booking procedure pursuant to Marion County Sheriff's Department policy.

Thomas alleges that Wyser violated her Fourth Amendment rights by having her arrested and charged without probable cause to believe that she had committed perjury.  She alleges that the Marion County Sheriff's Department

violated her Fourth Amendment rights by strip-searching her when she was booked into the jail.

Defendants have moved for summary judgment.  As explained below, the motion is granted as to the claims against Wyser because the undisputed facts show that he had probable cause to believe Thomas committed perjury.  Summary judgment is denied on the claim against the Marion County Sheriff's Department.  The constitutionality of a blanket policy requiring a strip search of all felony arrestees is at best controversial.  See *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 714 (9th Cir. 1990) (holding unconstitutional a blanket policy of strip-searching all felony arrestees with visual inspection of body cavities).  The factual record on this claim is sparse in this case, and the issue requires further factual and legal development before it can be resolved.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no

rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Id.* at 255. The moving parties need not positively disprove the opponent's case; rather, the moving parties must establish the lack of evidentiary support for the non-moving party's position. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. In light of this standard, the facts stated in this entry are not necessarily true in an objective sense; they are either undisputed or reflect the evidence in the light reasonably most favorable to plaintiff Thomas as the non-moving party.

I.     *Undisputed Facts on the Perjury Charge*

On July 29, 2002, Ella Thomas's son Danny Johnson attempted to rob Michael Krulewich and shot him several times. The shooting occurred on the east side of Indianapolis around 7:00 p.m. on July 29, 2002. Johnson was tried in the Marion Superior Court in October 2003. The jury found him guilty of attempted murder.

During the trial, Thomas testified that on the afternoon of July 29, 2002, she had driven her son from Indianapolis to Terre Haute, where his girlfriend, Taquilla Powell, was in labor and having their baby. Terre Haute is approximately 80 miles from the location of the shooting in Indianapolis. During her trial testimony, Thomas saw and referred to a copy of a Terre Haute hospital out-patient admission record for Powell on July 29, 2002, showing that Powell was admitted to a Terre Haute hospital at 5:10 p.m. (See Def. Ex. B, which was labeled as State's Ex. 13 at Johnson's criminal trial.) Because she had trouble remembering the precise date she took Johnson to Terre Haute, Thomas used the July 29 record as her frame of reference to date the trip. Pl. Ex. 3 at 37-38, 53-54, 63-65.

Powell did not give birth on July 29, 2002. She was discharged at 9:00 that evening. She returned to the hospital two days later, on July 31, 2002, and gave birth that day. Before the criminal trial, Johnson's defense attorneys and prosecutor Wyser had seen a hospital record showing that Powell had been discharged at 9:00 p.m. on July 29 and separate hospital records showing that she had been admitted again on July 31 and had actually given birth during that second visit. Neither the defense attorneys nor the prosecutor showed the July 31 documents to Thomas during her trial testimony. Neither the defense attorneys nor the prosecutor suggested to Thomas during her trial testimony that she simply might have been confused as to which day she took her son to Terre Haute.

She had "refreshed" her memory with only the July 29 record, and neither side clarified for her that Powell had gone to the hospital a second time on July 31.

After she completed her trial testimony, defendant Wyser had Thomas arrested for perjury.  Two days later, Wyser signed a probable cause affidavit that stated:

> The undersigned affiant swears or affirms that there is good cause to believe the following:  that on October 20, 2003, a jury trial was commenced in the case of State of Indiana vs. Danny L. Johnson, under cause number G060209FA231332.  The Defendant, Danny L. Johnson filed an alibi in said case, claiming that on July 29, 2002 he was at Union Hospital in Terre Haute, Indiana with his girlfriend, Taquilla Powell, B/F dob 6/16/80 while she was having their baby.  During the trial, Lori Turner and Marcia Eckard, two nurses who worked in the labor and delivery unit at Union Hospital testified that the father of the baby (Danny L. Johnson) was not present.  Additionally, two separate documents which were admitted into evidence indicated that the "father of baby" was not present.
>
> On October 21, 2003, during the jury trial, Taquilla Powell testified under oath that Danny L. Johnson, her boyfriend and father of her child (who was born on July 31, 2002) was in her hospital room when she awoke on July 29, 2002.
>
> On October 21, 2003, during the jury trial, Ella Thomas, B/F dob: 5/19/57 testified under oath that on July 29, 2002 that she drove her son, Danny L. Johnson to Union Hospital in Terre Haute, Indiana and took her son into the hospital to be with Taquilla Powell.
>
> At the conclusion of Taquilla Powell's and Ella Thomas's sworn testimony, they were arrested for Perjury a Class D Felony.

Pl. Ex. 1.

The probable cause affidavit did not include all of the information and all of the details known to Wyser to support the charge.  First, in general, Wyser had all the evidence that tended to show that Johnson had participated in the attempted robbery and the shooting in Indianapolis on July 29, 2002.  This evidence included guilty pleas and statements from two co-defendants who said that Johnson had planned and attempted the robbery and had shot Mr. Krulewich.  One of those co-defendants testified to that effect in a pre-trial deposition and during Johnson's criminal trial.  All of that evidence tended to show that Johnson was not in Terre Haute on July 29, 2002.

Second, Wyser had hospital records and the testimony of hospital nurses that tended to show that Powell had not been accompanied by the father of the baby or any other family member when she went to the hospital on July 29. Thomas has pointed out that the nurses' testimony did not foreclose the possibility that Johnson had been present on July 29.  See Pl. Ex. 3 at 9-12, 20-21.  Nevertheless, the hospital records and witnesses gave no indications that he had actually been present that day.  If the nurses had known that he was present upon either her admission or discharge, they ordinarily would have noted his presence in the records.

Third, Wyser gave Thomas warnings and opportunities during the criminal trial to modify her testimony.  She did not do so.  Wyser had taken Thomas's deposition several months before the criminal trial.  In that deposition, Thomas

testified that on July 29, 2002, she had left work in Indianapolis between 3:00 and 3:30 p.m., and then picked up Johnson and took him to Terre Haute because Powell was getting ready to have a baby. Def. Ex. F at 12-13. She estimated that she had dropped Johnson off at the hospital in Terre Haute at approximately 6:00 p.m. *Id.* at 14. She also testified that she had not seen Johnson for the next four or five days, until he called her to pick him up in Terre Haute.

Thomas testified in Johnson's criminal trial on October 21, 2003. She testified on direct examination that she had driven Johnson to Terre Haute after she left work on July 29, 2002. She said that she had verified that she had worked on July 29 by checking records at her job. Def. Ex. G at 37-38. Based on Powell's July 29 hospital record, Thomas testified that she took Johnson to Terre Haute on July 29. *Id.* She testified that she took Johnson to Terre Haute because his "baby mother was in labor." *Id.* at 40. She testified that the baby had been born two days after she had driven Johnson to Terre Haute. *Id.* at 42.

On cross-examination by Wyser, Thomas testified that Powell went into labor on July 29. *Id.* at 53. She repeated that she had made the trip to Terre Haute on July 29. *Id.* at 61. Wyser then tried to lock her into that testimony at the end of the cross-examination:

> Q.   Miss Thomas, do you understand you're under oath here today?
> A.   Yes.
> Q.   You understand what the penalties of perjury are?
> A.   Yes.

Q.    That means if you get up on the stand here and you lie you can be charged with the crime of perjury.  Do you understand that?

A.    Yes, sir.   That's why I'm trying to say what's on these papers.

Q.    And is it your testimony today that on July 29th, 2002, that you drove the defendant, Danny Johnson, to Terre Haute, Indiana?

A.    According to those admission paper, that's when she went in.

Q.    No, don't tell me according to papers.  I'm asking you what you did.

A.    According to those admission paper, if it was on the 29th, that's the day.  That's what I'm trying to explain to you.  The paper they sent me said the 29th.  That's the day I drove Danny down there.

Q.    Well, she had her baby on July 31st, Miss Thomas.

A.    Yeah, but –

Q.    I'm asking you what day that you drove Danny Johnson down to Terre Haute.

A.    On the 29th.

Q.    Of July of 2002.

A.    Of, of 2002.  That's what the paper said.

*Id.* at 63-64.  Wyser did not confront Thomas with the additional July 31 hospital records to ask whether she simply might have been mistaken about which day she took her son to Terre Haute.  During redirect examination, Johnson's lawyers did not show her any further documents, such as Powell's discharge summary from July 29 or the separate admission record for July 31.  (Johnson's lawyers obviously had no incentive to suggest that Thomas might have been honestly mistaken about the date she went to Terre Haute.  A lawyer advising Thomas about her own interests might have wanted to explore that possibility.)

During Johnson's trial, Powell also testified as an alibi witness just before Thomas testified.  Powell testified that Johnson was present with her at the hospital on July 29.  After Powell testified, Wyser had her arrested for perjury too.  Powell later pled guilty to the charge.  Thomas's criminal case was ultimately

resolved with an agreement that Thomas pay $500 to the Victims of Violent Crimes Fund in exchange for the case's dismissal. Def. Ex. A at 42-43.[1]

In this civil case, Thomas testified in a deposition in 2006 after reviewing all the hospital records. She testified then that she did not know whether she drove Johnson to the Terre Haute hospital on July 29 or July 31. Thomas Dep. 15-17, 28-29.

II.    *Analysis of Claim Based on Perjury Charge*

    A.    *Probable Cause*

Plaintiff Thomas asserts that defendant Wyser violated her Fourth Amendment rights by having her arrested to punish her for testifying in defense of her son. The claim against Wyser challenges his actions beyond the scope of prosecuting cases, so there is no issue of absolute prosecutorial immunity. In this case, Wyser stands in the same shoes as any law enforcement officer who makes or causes an arrest.

---

[1]Defendant Wyser points out that Thomas's lawyer in the perjury case argued for lenience, not for factual innocence, in negotiating the case. Wyser asserts that he agreed to dismiss the case because he did not want Thomas to lose her job, which would have been automatic if she had been convicted of either a felony or a misdemeanor. Def. Ex. A at 42-44. Thomas has not challenged the accuracy of this testimony for purposes of summary judgment.

The central issue is whether Wyser had probable cause to have Thomas arrested for perjury.  Probable cause is a complete defense to this claim.  See *Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003); *Juriss v. McGowan*, 957 F.2d 345, 349 n.1 (7th Cir. 1992); *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989).  A law enforcement officer has probable cause to arrest when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to support a prudent person in believing the suspect has committed an offense.  *Booker v. Ward*, 94 F.3d 1052, 1057 (7th Cir. 1996); *Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995).

Indiana law establishes the crime of perjury with which Thomas was charged:

> (a)   A person who:
> (1)   makes a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true; or
> (2)   has knowingly made two (2) or more material statements, in a proceeding before a court or grand jury, which are inconsistent to the degree that one (1) of them is necessarily false;
> commits perjury, a Class D felony.

Ind. Code § 35-44-2-1.

The undisputed facts show that prosecutor Wyser had available to him a variety of reasonably reliable evidence that tended to show that Thomas was not telling the truth when she testified during Johnson's trial that she took Johnson to Terre Haute the same evening the crime occurred.  First, Wyser had evidence

from co-defendants that tended to show that Danny Johnson had participated in the attempted robbery and the shooting of Mr. Krulewich on July 29. Second, Wyser had hospital records and the testimony of hospital nurses that tended to show that Powell arrived at and remained in the hospital alone on July 29. Third, Wyser gave Thomas opportunities during the criminal trial to modify her testimony, and she did not do so. See Def. Ex. G at 63-64.

Honestly mistaken testimony is not perjury, and the state of mind of the person testifying falsely can pose a difficult factual question. See, *e.g.*, *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (observing that a witness commits perjury if she willfully testifies falsely, rather than "as a result of confusion, mistake, or faulty memory"); *United States v. Libby*, 429 F. Supp. 2d 1, 12 (D.D.C. 2006) (evaluating defendant's request for classified documents to show he was preoccupied with weighty matters of state and did not intend to testify falsely to grand jury investigating leak of classified information); *Carter v. State*, 738 N.E.2d 665, 673 (Ind. 2000) ("Confused or mistaken testimony is not perjury."). Wyser knew that Thomas had a motive to lie to help her son. The undisputed facts also show that he had reason to believe that her incorrect alibi testimony was not the result of an honest mistake. Thomas did not express doubt about the date in either her pre-trial deposition or trial testimony in the criminal case.

The court assumes for purposes of summary judgment that Wyser did not have conclusive evidence to prove that Thomas had intentionally testified falsely,

but he did not need conclusive evidence.  The arresting officer's belief that a crime has been committed does not need to be correct, so long as his belief was reasonable.  *E.g.*, *Wollin v. Gondert*, 192 F.3d 616, 623 (7th Cir. 1999) (affirming summary judgment on grounds of qualified immunity where arresting officer had "arguable probable cause"), citing *Texas v. Brown*, 460 U.S. 730, 742 (1983).  The undisputed facts show that Wyser had a reasonable basis for concluding that Thomas had intentionally testified falsely.  (In addition, the court is confident that the evidence would have been sufficient to submit the question to a jury if Thomas's perjury case had gone to trial on this record.)

For purposes of showing Johnson's guilt, a prosecutor might have been content with showing either an honest mistake or deliberate perjury.  Thomas argues now in this civil action that if Wyser had shown her all of the hospital documents, she would have realized that she might have been mistaken and that she was not sure whether she took her son to Terre Haute on July 29 or July 31.  But Wyser was not required to assume that Thomas – the mother of the accused – was trying her best to be honest while giving testimony that Wyser reasonably considered to be utterly false.  Recall that during her trial testimony, Thomas acknowledged that Powell gave birth two days after July 29, when Thomas said she dropped Johnson off at the hospital.  Pl. Ex. 3 at 42.  That testimony tends to weigh against the honest mistake theory, though it is not conclusive on the matter.  For all of these reasons, the undisputed facts show that Wyser had probable cause to conclude that Thomas had committed perjury.

B.     *Alleged Concealment and Misrepresentation*

In opposing summary judgment, Thomas contends that Wyser's affidavit of probable cause concealed and misrepresented information.   If a finding of probable cause has been based on an officer's intentional misrepresentation or concealment of material facts, a plaintiff may be able to pursue a Fourth Amendment claim challenging the arrest.  *Schertz v. Waupaca County*, 875 F.2d at 582 (affirming summary judgment for arresting officers); *Jones v. City of Chicago*, 856 F.2d 985, 992-94 (7th Cir. 1988) (affirming verdict against officers who deliberately submitted false information leading to arrest and charges). Thomas argues that the nurses did not actually testify that the father of the baby was not present, as Wyser claimed in the affidavit.

Wyser's probable cause affidavit stated:  "During the trial, Lori Turner and Marcia Eckard, two nurses who worked in the labor and delivery unit at Union Hospital testified that the father of the baby (Danny L. Johnson) was not present. Additionally, two separate documents which were admitted into evidence indicated that the 'father of baby' was not present."  Pl. Ex. 1.

The undisputed facts show that both nurses offered testimony that can fairly be construed as saying that Danny Johnson was not present at the hospital on July 29, as Wyser stated in his affidavit.  Nurse Turner testified about the July 29 admission document:

-13-

> Q.   And just below that there's a notation, it looks like a minus sign with a circle around it, and FOB.  Is that what this is?
> A.   That's correct.
> Q.   And what does that mean?
> A.   No involvement with father of baby.
> Q.   Does that mean the father of the baby was not present?
> A.   That's correct.

Def. Ex. C at 6.  Nurse Eckard testified about the same record:

> Q.   And just below that there's a box for Significant Other.
> A.   That's correct.
> Q.   Had the patient had a significant other with her, the father of the baby, would you have checked that box off?
> A.   Yes.
> Q.   And the fact that you did not check that off, would that indicate that he was not present?
> A.   Yes.

Def. Ex. D at 19.

With that said, the nurses' complete testimony was a little more complicated than Wyser's affidavit indicated.  On cross-examination by Johnson's attorneys, Turner acknowledged that if a visitor had come to the patient's room after the patient had been admitted, the hospital records might not show that fact.  Def. Ex. C at 9-12.  Eckard similarly acknowledged that possibility.  Def. Ex. D at 20-21. Wyser's two sentences about the nurses' testimony and the hospital documents did not reflect that possibility, but the difference between his short summary and the more complete picture does not defeat the undisputed showing of probable cause.  By the same token, Thomas's assertion that Turner's testimony showed

"at best" that she did not know if Johnson was present, Pl. Resp. 9, also does not fully capture the issue.

Nurses Turner and Eckard could testify only about what they knew.  They had little or no independent recollection of Powell and her admission on July 29. They knew, however, that there were no indications that the father (Johnson) had been present on July 29.  They also knew that hospital records probably would have reflected his presence if he had been with Powell when she was admitted or when she was discharged and might have done so if he was ever present with Powell in the hospital.

If one considers the nurses' testimony in isolation, however, their testimony did not foreclose the possibility that Johnson might have arrived to see Powell after she was admitted and might have left before she was discharged.  For purposes of evaluating the probable cause question, however, the nurses' testimony cannot and should not be considered in isolation.  Wyser was aware also of all the direct evidence against Johnson (including statements from two co-defendants and testimony from one of them) showing that he was guilty and that he could not possibly have been in Terre Haute when his mother said he was.

More to the point, even now, Thomas does not contend that Johnson was actually present with Powell in the hospital on July 29.  The evidence before this court on summary judgment shows beyond reasonable dispute that he was not

in fact present then.  The differences between Wyser's brief summary in the affidavit and the more complete picture therefore would not allow a reasonable jury to find that probable cause was lacking when Wyser had Thomas arrested for perjury or to infer that Wyser misrepresented the facts in his affidavit.

C.   *Failure to Refresh Recollection*

Thomas also argues that Wyser violated her rights by failing to give her all of the hospital documents to refresh her recollection when she testified during the trial.  Thomas has offered evidence indicating that Wyser had copies of Powell's hospital records from both July 29 and July 31 when he cross-examined Thomas at trial.

Thomas has not cited any authority to support the theory that the cross-examining attorney had an obligation to assist the witness with the most complete possible refreshment of her recollection.  The court is not aware of any support for that theory.  (As noted, the undisputed facts before this court show that Johnson was not actually present in Terre Haute on the evening of July 29 and that Thomas's contrary testimony during Johnson's trial was factually incorrect.)

In a variation on this general argument, Thomas also asserts that Wyser violated Rules 3.3, 3.4, and 3.8 of the Indiana Rules of Professional Conduct by not using all of the available hospital records to refresh her recollection.  Thomas

has not provided a cogent legal argument that would allow her to establish that a violation of any of these rules would support a civil claim against Wyser under the federal Constitution.[2]  Apart from that gap in the legal argument, as a matter of fact, Thomas has not offered an evidentiary basis for making any of these serious professional charges against Wyser.

Rule 3.3 states that a lawyer shall not knowingly make a false statement of fact or law to a tribunal and shall not offer evidence that the lawyer knows to be false.  Thomas has not offered evidence that Wyser did either of these things.  The differences between the short summary of the nurses' evidence and the hospital records and the more complete picture painted by the entire record do not amount to a false statement by Wyser.

Rule 3.4 provides that a lawyer shall not unlawfully obstruct another party's access to evidence or conceal a document or other material having potential evidentiary value.  Again, there is no evidence that Wyser did either of those things.  The other party to the proceedings was criminal defendant Danny Johnson.  Wyser did not withhold or conceal evidence from Johnson or his lawyers.  Rule 3.4 did not impose on Wyser an obligation to be as thorough and

---

[2]A prosecutor's violation of Rule 3.8 might  amount to a violation of federal constitutional rights as interpreted in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that prosecutors have an obligation to provide material, exculpatory evidence to the defense), and its progeny.  In such cases, the cause of action is based on a violation of the federal constitutional standard, regardless of state rules governing attorneys' conduct.

gentle as possible in refreshing the recollection of a defense witness in that trial. As for the prosecution of Thomas herself, there is no evidence that Wyser failed to comply with these duties.   Moreover, Thomas's prosecution ended with dismissal of the perjury charge.

Rule 3.8 imposes special responsibilities on prosecutors in criminal cases, including a duty to refrain from prosecuting a charge that is not supported by probable cause and a duty to timely disclose to the defense all exculpatory evidence.   There is no evidence that Wyser failed to do so in the Johnson case. There is also no evidence that Wyser failed to do so in the prosecution of Thomas herself, which again ended with dismissal of the charge.   Accordingly, defendant Wyser is entitled to summary judgment on the claims against him.[3]

III.   *Undisputed Facts on the Jail Strip Search*

After Thomas was arrested for perjury outside the courtroom, she was taken to the Arrestee Processing Center ("APC") operated by the Indianapolis Police Department.   Upon her arrival, a female officer strip-searched Thomas.   The

---

[3]Thomas's complaint includes a theory of negligence under state law. Indiana law does not recognize a theory of negligent false arrest but uses the same standard that applies under the Fourth Amendment.   See *Conwell v. Beatty*, 667 N.E.2d 768, 775 (Ind. App. 1996) (observing that proof of absence of probable cause is essential to state law claim for false arrest); *Garrett v. City of Bloomington*, 478 N.E.2d 89, 93-95 (Ind. App. 1985) (observing that Indiana law parallels federal law in false arrest cases and that plaintiff must prove bad faith or absence of probable cause).   Wyser is therefore entitled to summary judgment on the state law claim against him.

female officer required Thomas to step behind a curtain, remove all of her clothes, hand the clothes to the officer, and then lift her breasts, open her mouth, and lift her tongue.  Finally, the officer required Thomas to squat and cough with her back toward the officer.  Thomas Dep. 34.  Thomas was at the APC between 6:51 p.m. on October 21, 2003, and 3:03 a.m. on October 22, 2003.  See Crisler Dep. 13-14.  Thomas has not asserted any claims against the Indianapolis Police Department or its officers based on the strip search at the APC.[4]

Thomas arrived at the Marion County Jail intake facility at 12:20 p.m. on October 22, 2003.  She went through a similar strip search at the Marion County Jail.  One officer who brought her to the jail told the intake officer that Thomas had already been strip-searched.  The intake officer replied that they would do it again.  Thomas Dep. 35.[5]  Thomas was required to step behind a curtain, remove all of her clothes, hand the clothes to the officer, and then lift her breasts, open her mouth, and lift her tongue.  Finally, she was required to squat and cough twice, once with her back toward the officer and once facing the officer.  Thomas

---

[4]At the time of these events, the Indianapolis Police Department and the Marion County Sheriff's Department were separate agencies responsible to two different elected officials.  On January 1, 2007, the two agencies merged to become the Indianapolis Metropolitan Police Department under the direction of the elected Sheriff of Marion County.

[5]Defendants contend that this testimony is hearsay.  It is not.  Plaintiff offers this evidence not for the truth of the matter asserted but to show that the Marion County Jail personnel who strip-searched her believed that she had already been strip searched at the APC.  That point is relevant to one of plaintiff's legal arguments, though the court is not ultimately persuaded by it.  Also, the evidence is undisputed that plaintiff had already been strip-searched at the APC.

Dep. 36.  In both strip-searches, Thomas was alone with a female officer.  Neither officer touched her during the course of the searches, and no one else could see her.

In October 2003, the Marion County Jail had a policy permitting a strip search of inmates if reasonable suspicion arose to believe that the prisoner had weapons, narcotics, or other contraband concealed on her body.  Def. Ex. M (Policy 125).  That same policy required strip searches of incoming inmates charged with felony offenses.  *Id.*  The stated purpose of the policy and others relating to inmate searches was to ensure that inmates were not concealing weapons or other contraband, such as drugs, matches, cigarette lighters, and tobacco products.  Strip searches at the jail have discovered marijuana, cocaine, tobacco, rolling papers, matches, jewelry, paper, change, and even a car key.  Def. Ex. L. ¶ 7.  Matches, tobacco products, and cigarette lighters pose several dangers within a jail.  They can be used to start disruptive fires and can be the subject of fights between inmates.  Drugs can also be the subject of fights between inmates, and inmates who have taken drugs can be difficult to control and can become ill. The dangers posed by weapons are obvious, of course, but it is less obvious to lay persons that many ordinary objects can be used as weapons in a jail, including pens and pencils, staples, hairpins, straight pins, and razors.  Def. Ex. L ¶ 10. The defense has offered evidence from one jail official about a weapon having been made in jail by inserting a metal staple into a pencil eraser.  *Id.*

At the time of her arrest in October 2003, Thomas had no criminal record, and jail officials had no reasonable suspicion that she was concealing drugs, weapons, or other contraband.

IV.    *Analysis of the Jail's Strip Search Policy*

There is no doubt that the strip searches Thomas experienced were highly intrusive.  See *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (describing strip searches involving the visual inspection of the anal and genital areas as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission"); accord, *Bell v. Wolfish*, 441 U.S. 520, 558 (1979) (recognizing that the practice of requiring visual inspection of body cavities gave the Court majority "the most pause" in case challenging numerous prison conditions and practices); *Kennedy*, 901 F.2d 702 at 711 ("The intrusiveness of a body-cavity search cannot be overstated.").  In *Mary Beth G.*, the Seventh Circuit held that a jail's policy of strip-searching all female prisoners (but not all male prisoners) charged with misdemeanors and briefly awaiting release on bond was unreasonable under the Fourth Amendment.  *Id.* at 1273.

This claim by Thomas is a challenge to a municipal government's policy pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690-91 (1978).  Thomas has sued the Marion County Sheriff's Department rather

than any individual deputies.  She contends that the policy authorizing strip searches is unreasonable under the Fourth Amendment, at least as applied to her. The undisputed facts show that Thomas had been charged with a felony, perjury, but there was no individualized suspicion that she might have been concealing weapons, drugs, or other contraband in her clothing or in a body cavity.

The issue here is whether the Fourth Amendment prohibits the jail from strip-searching all inmates charged with felonies or whether instead the policy must be more discriminating based on individual charges and circumstances.  The overall standard is one of reasonableness.  See *Bell*, 441 U.S. at 558-60 (holding that visual body cavity searches of all pretrial detainees in federal detention facility after every contact visit with person from outside institution were reasonable under Fourth Amendment).  Under *Bell*, the court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Id.* at 559.

The scope of the intrusion is substantial in this case.  Cf. *Stanley v. Henson*, 337 F.3d 961, 965 (7th Cir. 2003) (affirming summary judgment for defendants where female jail officer watched female inmate exchange street clothing for jail uniform in semi-private setting, without more intrusive features of strip search present in this case).  The search in the present case did not involve visual inspection of any body cavity other than the mouth, unlike the strip-searches in *Bell v. Wolfish* and *Kennedy v. Los Angeles Police Department*.  The manner of the

search in this case shows nothing beyond what is inherent in the scope of the search.  Pursuant to the policy, and as shown by the evidence, the jail's strip search of Thomas occurred with only one female officer present and watching. The officer did not touch Thomas during the process.

As the Supreme Court explained in *Bell*, the justification for the strip search is obviously safety of inmates and jail staff:

> A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.  And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, App. 71-76, and in other cases.  *E.g., Ferraro v. United States*, 590 F.2d 335 (CA6 1978); *United States v. Park*, 521 F.2d 1381, 1382 (CA9 1975).

*Bell*, 441 U.S. at 559.  Dissenting Justices in *Bell* argued that the security concerns were exaggerated, in light of evidence that inmates would have to remove the top half of their one-piece jump suits to hide objects in vaginal or anal cavities and that corrections officers visually monitored all contact visits.  See *id.* at 577-78 (Marshall, J., dissenting); *id.* at 594-95 (Stevens, J., dissenting).  The record in this case would not support similar criticisms of the jail's security rationale for the policy of searching new inmates arriving at the jail.

Thomas argues that it was unreasonable for her to be searched again at the jail because she had already been strip searched at the APC.  At that time, the jail officials had no direct control, however, over the competence and thoroughness

of the APC searches conducted by the Indianapolis Police Department.  A jail official testified that during jail searches, officers "tend to get weapons from them even though they've come from the APC, knives, pens, pencils, pin – straight pins." Crisler Dep. 34.  That testimony stands uncontradicted and unchallenged on this record.  The Marion County Jail was not required to trust other agencies to carry out its intake searches of new inmates.  It had an independent duty to protect the safety of its employees and other inmates.

Thomas also argues that because she had already posted bond, she should not have been strip searched.  This claim is unsupported by evidence, however. In support of the point, Thomas cites the deposition of David Crisler, a jail official. The cited passage read:

> Q    If the papers indicated that Ella's [Thomas's] bond was posted the evening before on 10/21 at about 8 p.m. or so, could you tell me why she wouldn't have been released then?
> A    No, other than it takes a while for the bond to be processed and catch up with the inmate.

Crisler Dep. 21.  The question assumed that some unidentified "papers" indicated that bond had been posted many hours earlier, but the question is not evidence. Plaintiff has not cited and the court has not located any other evidence supporting this factual assertion, so the court disregards it.

Thomas also argues that she was charged with only a non-violent felony and that there was no reason to believe that she was concealing any weapon or other

contraband.  Thomas has not offered any authority to support her argument that a jail's policy of strip-searching all persons charged with felonies is unconstitutional.  In *Mary Beth G.*, the Seventh Circuit based its decision on the relatively minor charges the plaintiffs faced, as well as the absence of any individualized suspicion of concealed contraband.  723 F.2d at 1272-73; accord, *Edwards v. State*, 759 N.E.2d 626, 629 (Ind. 2001) (holding that blanket policy of strip-searching all misdemeanor arrestees violated federal and state constitutions); see also *Gray v. City of Columbus*, 2000 WL 683394, at *10-11 (S.D. Ind. Jan. 31, 2000) (denying summary judgment for police officers who allegedly subjected plaintiff to strip search and body cavity search without placing the plaintiff under arrest).

The court is not aware of any controlling decision by the United States Supreme Court or the Seventh Circuit holding that the United States Constitution either requires or does not require individualized suspicion before an inmate who is facing felony charges and who is about to enter a jail's general population can be subjected to a visual strip search for weapons or other contraband.  See generally *Kraushaar v. Flanigan*, 45 F.3d 1040, 1046 (7th Cir. 1995) (affirming summary judgment allowing strip search of DUI arrestee where arresting officer suspected contraband was hidden in pants, and noting that even a thorough hand search through clothing will not necessarily turn up small items such as LSD on postage stamps, a small rock of crack cocaine, or a razor blade); see also *Peckham v. Wisconsin Dep't of Corrections*, 141 F.3d 694, 697 (7th Cir. 1998)

(affirming summary judgment holding that strip searches of prison inmates upon arrival and after court, doctor visits, or contact visits with visitors did not violate Fourth Amendment).

In *Kennedy v. Los Angeles Police Department*, 901 F.2d 702, 712-14 (9th Cir. 1990), however, the Ninth Circuit held that a Los Angeles policy requiring a strip search (with visual inspection of body cavities) of all persons arrested for felonies violated the Fourth Amendment.[6]  The court acknowledged both the intrusiveness of the searches and the substantial interests that can support such intrusive searches in a detention facility.   The court concluded that the felony/misdemeanor distinction was not reasonably related to the legitimate penological reasons that can support such intrusive searches.  901 F.2d at 713-14 (adopting reasoning of district court, 667 F. Supp. 697, 702-03 (C.D. Cal. 1987)). The Ninth Circuit concluded:   "In short, the LAPD's felony/misdemeanor classification alone indicates little about the likelihood of the arrestee's concealing drugs, weapons, or contraband, the basis for subjecting an arrestee to a visual body-cavity search."  901 F.2d at 714.  Accord, *Murcia v. County of Orange*, 226 F. Supp. 2d 489, 494-95 (S.D.N.Y. 2002) (holding that county jail's blanket policy of

---

[6]*Kennedy* held, consistent with a long line of Ninth Circuit decisions, that issues of qualified immunity under 42 U.S.C. § 1983 should be submitted to a jury.  That portion of the decision was effectively overruled by the Supreme Court's decision in *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991) .  See *Way v. County of Ventura*, 445 F.3d 1157, 1159 (9th Cir. 2006) (recognizing that *Kennedy* had been overruled on that point).  *Kennedy* remains intact in its treatment of the strip search policy for all felony arrestees.

strip-searching all felony arrestees was unconstitutional, but granting summary judgment to individual defendant based on qualified immunity).[7]

The factual record concerning the strip search claim in this case is sparse. The Sheriff's Department's evidence addresses the general safety concerns that support intrusive strip searches of many arrestees, and perhaps even of all arrestees. That evidence contains no comparative information, however, that supports the administrative convenience of treating all felony arrestees in the same way. Nor does the evidence provide any information about how effective less intrusive measures may be, combined with intrusive strip searches for arrestees for whom there is individualized suspicion of hidden weapons or contraband, based either on the nature of the charged offense(s) or additional information specific to the particular arrestee. The court recognizes that the Supreme Court criticized "less-restrictive-alternative" analysis in this context in *Bell v. Wolfish*, 441 U.S. at 559 n.40. At the same time, the balancing test adopted in *Bell* calls for more detailed and comparative evidence than has been provided in this record. The court's consideration of the justification for the intrusion should not be uncritical. Along these lines, the discussions in both the majority and dissenting opinions in *N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004) (addressing strip

---

[7]A similar policy requiring strip searches of detainees charged with felonies was challenged in *Smith v. Dearborn County*, 244 F.R.D. 512 (S.D. Ind. 2007) (certifying plaintiff class). A settlement is pending in that case after the county modified its policy. See *Smith v. Dearborn County*, No. 4:06-cv-75-WGH-SEB (S.D. Ind. Jan. 7, 2008) (granting preliminary approval to settlement).

searches of girls detained in juvenile detention centers), illustrate the types of evidence on need and efficacy that may be useful in applying the balancing test.

*Conclusion*

At this time, therefore, the court GRANTS defendants' motion for summary judgment as to all claims against defendant Wyser and DENIES the motion with respect to the Fourth Amendment claim challenging the Marion County Sheriff's Department's policy of strip-searching all persons arrested for felony charges.

So ordered.

Date: February 15, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Gail M. Flatow
gail@flatowcomer.com

Lakshmi Devi Hasanadka
OFFICE OF CORPORATION COUNSEL
lhasanad@indygov.org